**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Credit Suisse Lending Trust
(USA) 2 and Credit Suisse
Lending Trust (USA) 3

    v.                                    Civil No. 11-cv-054-LM

Phoenix Life Insurance Company
and PHL Variable Insurance Company


**<u>O R D E R</u>**


Plaintiffs (hereinafter "Credit Suisse") have sued
defendants (hereinafter "Phoenix") in five counts.  Credit
Suisse seek damages, declaratory relief, and injunctive relief,
all in anticipation of the impending cancellation of three
policies of life insurance that were issued by Phoenix and
assigned by their owners to Credit Suisse.  Before the court is
a motion in which Phoenix asks the court to dismiss Credit
Suisse's claims or, in the alternative, to abstain from this
action or stay it until an indispensable party has been joined.
Credit Suisse objects.  The court held a hearing on Phoenix's
motion on August 1, 2011.  For the reasons that follow,
Phoenix's motion to dismiss is granted.

**The Legal Standard**

A motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under Rule 12(b)(6), a trial court "accept[s] as true all well-pled facts in the complaint and draw[s] all reasonable inferences in favor of plaintiffs." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 771 (1st Cir. 2011) (quoting SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" United Auto., Aero., Agric. Implement Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 40 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)).  On the other hand, a Rule 12(b)(6) motion should be granted if "the facts, evaluated in [a] plaintiff-friendly manner, [do not] contain enough meat to support a reasonable expectation that an actionable claim may exist." Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008) (citing Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555-56 (2007); Morales-Tañon v. P.R.
Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008)).

## Background

The following facts are drawn from plaintiffs' complaint,
see United Auto. Workers, 633 F.3d at 40, and certain matters of
public record, see Giragosian v. Ryan, 547 F.3d 59, 65-66 (1st
Cir. 2008) (citing Trans-Spec Truck Serv., Inc. v. Caterpillar
Inc., 524 F.3d 315, 321 (1st Cir. 2008); Banco Santander de P.R.
v. Lopez-Stubbe (In re Colonial Mortg. Bankers Corp.), 324 F.3d
12, 15-16 (1st Cir. 2003); Boateng v. InterAmerican Univ., Inc.,
210 F.3d 56, 60 (1st Cir. 2000)).

Phoenix issued life insurance policies ("the policies") to
each of three irrevocable trusts ("the ownership trusts").  Each
of those trusts: (1) owns a policy issued by Phoenix; (2) is the
beneficiary of the policy it owns; and (3) has its own
beneficiary, a second irrevocable trust ("the beneficiary
trust").  The policies each contain provisions entitled
"Assignment," which provide, in pertinent part:

> Except as otherwise provided in this policy, you may,
> by written notice, assign any interest in this policy
> without the consent of any person other than an
> irrevocable Beneficiary.  The assignment or a
> certified copy of it must be filed with us at our
> Main Administrative Office.  When filed, it will bind
> us as of the date of the assignment, subject to any
> action taken by us before such filing. . . .  The
> interest of the assignee shall be prior to the

interest of any beneficiary not irrevocably named or
any contingent owner.

Compl. ¶¶ 12, 19, 26.

Credit Suisse has received collateral assignments of each
of the policies from the ownership trusts in exchange for its
promise to finance the payment of premiums to Phoenix.  Among
other things, those collateral assignments granted Credit Suisse
the sole rights to: (1) collect the net proceeds of the policies
due to the deaths of the insureds or maturity; and (2) withdraw
from or surrender the policies and receive their surrender
values.  With respect to each policy assigned to Credit Suisse,
Phoenix executed documents titled "Insurer's Consent and
Acknowledgment" ("Acknowledgement").  Each of the
Acknowledgements provides, in pertinent part:

> The undersigned hereby acknowledges and consents to
> the attached Assignment of Life Insurance Policy as
> Collateral, confirms that it has not previously
> received notice of any other collateral assignment of
> or security interest in the insurance policy issued by
> the undersigned, and while the Assignment remains in
> effect agrees to pay all amounts due under such
> insurance policy specified therein to Credit Suisse
> Lending Trust (USA) 3 . . . with the balance
> thereunder payable by Credit Suisse Lending Trust
> (USA) 3 to the persons or entities designated in such
> policy.  The undersigned is not a party to the
> Assignment.

Def.'s Mot. to Dismiss, Ex. 4 (doc. no. 19-6).

Noble Trust Company ("Noble") served as "Protector" of the
three ownership trusts and as the trustee of the three

4

beneficiary trusts.  Noble is currently the subject of a liquidation proceeding in the New Hampshire Superior Court.  On March 27, 2008, Judge Mangones issued an Order Appointing Liquidator that includes the following relevant provisions:

> (d)  The Liquidator is directed forthwith to take possession of and secure the assets [and] property . . . of [Noble] . . . and to administer them <u>under the orders of the Court</u>, and is vested with exclusive possession, custody and control of all of the property [and] contracts . . . of [Noble] . . . wherever located and by whomever possessed . . . ;

> . . . .

> (j)  To the full extent of the jurisdiction of the Court and the comity to which the orders of the Court are entitled, all persons are hereby permanently enjoined and restrained from any of the following actions:

> . . . .

> (3)  any act to obtain possession of property of [Noble] . . . or to exercise control over property of any of [Noble], including, without limitation, any act to terminate, cancel, revoke, void or otherwise alter any policies of insurance (i) issued to or for the benefit of [Noble] or any of its clients . . . unless such termination, cancellation, revocation or alteration shall have first been approved by either the Liquidator or this Court . . . ;

> . . . .

> (<u>l</u>)  The Court hereby seeks and requests aid and recognition of . . . any Federal Court . . . to act in aid of and to be complementary to this Court in carrying out the terms of the Order.

Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 19-3), at 3-5 (emphasis added).  In a subsequent Order clarifying the Order quoted above, Judge Mangones stated, with regard to the issuers of insurance policies in which Noble held an interest:

> 1.   Service of the Liquidation Order . . . is sufficient and effective to bind each of the Insurers . . . to its terms, as amended and clarified;
>
> 2.   The Liquidation Order is intended and means to prevent and enjoin the Policies . . . from lapsing for nonpayment or nonperformance of any obligation due, overdue, or becoming due thereunder, pending either the Liquidator's consent or further order of this Court; and
>
> 3.   Each of the Insurers is enjoined from claiming that any of the Policies (i) has lapsed, terminated or otherwise expired, or (ii) can lapse, terminate or otherwise expire, by reason of any nonpayment of any premium or other obligation due, overdue or becoming due thereunder, pending either the Liquidator's consent or further order of this Court.

Def.'s Mot. to Dismiss, Ex. 2 (doc. no 19-4), at 1.

On September 4, 2008, the Liquidator issued an inventory of Noble's assets that included the three Phoenix policies at issue in this case.  The Liquidator prefaced the inventory by stating, among other things:

> [T]he Inventory is not intended to differentiate between assets or property held by [Noble] in its individual capacity from those in which [Noble] has an interest in a representative capacity, either as trustee, subtrustee, trust protector, or any other representative or fiduciary capacity.

Def.'s Mot. to Dismiss, Ex. 6 (doc. no. 19-8), at 1.  Not only
did the inventory list the policies themselves as trust assets,
but it also noted the assets and liabilities associated with
premium-financing loans taken out by Noble trusts to purchase
insurance policies.

By letter dated November 13, 2008, the Liquidator: (1)
informed Credit Suisse of the two Superior Court Orders quoted
above; (2) indicated that the insurance companies that had
issued policies financed by Credit Suisse were restrained from
requiring the payment of premiums and from terminating or
lapsing policies for non-payment of premiums; (3) reiterated his
belief that the policies financed by Credit Suisse were subject
to the court Orders in the liquidation proceeding; and (4)
provided Credit Suisse with instructions for filing claims in
the liquidation proceeding.  Def.'s Mot. to Dismiss, Ex. 9 (doc.
no. 19-11), at 2-3.  Credit Suisse has never filed a claim in
the liquidation proceeding.

On June 21, 2010, the Liquidator submitted a Plan of
Liquidation ("Plan").  The Plan sets out both the principles
undergirding it and various specifics related to: (1) the
disposition of the insurance policies included in the
Liquidator's inventory; and (2) the Superior Court's continuing
jurisdiction over the Plan and any ancillary agreements

associated with it.  Among other things, the Plan calls for the liquidation of all insurance policies in which Noble has any interest, with the proceeds placed in a pool from which Noble's clients and creditors will be compensated on a pro rata basis. But, the Plan has yet to be approved by the Superior Court, owing to the fact that the liquidation proceeding has been indefinitely stayed.  See Pl.'s Mem. of Law, Ex. J (doc. no. 21-11); Ex. K (doc. no. 21-12), ¶ 6.  Finally, it appears that no deadline for filing objections to the Plan has yet been set by the Superior Court.  See id., Ex. I (doc. no. 20-10).

At about the same time the Liquidator submitted the Plan, he reached a Settlement and Release Agreement ("Settlement Agreement" or "Agreement") with Phoenix.  The Agreement recites that "the Liquidator is aware that one or more entities claim a security interest or other interest in the Policies, including by virtue of having claimed to have made premium finance loans to trusts or sub-trusts formed by or at the direction of [Noble]."  Def.'s Mot. to Dismiss, Ex. 8 (doc. no. 19-10), at 2. The Agreement also provides that it "is subject to the entry of a final order by the Liquidation Court in the Liquidation Proceeding approving this Agreement," id. at 3.  The Agreement includes the following relevant provisions:

2.   The Court Approval shall bar any and all
third parties (including, but not limited to . . . any
and all lenders or other persons or entities claiming
an interest in the Policies (collectively "Third
Parties")) from pursuing claims against Phoenix or the
Liquidator related in any way to the Policies . . .
this Agreement, or the Liquidation Proceeding.  . . .
All liens, claims, encumbrances and interests in the
Policies asserted by any and all Third Parties shall
be administered and adjudicated in the Liquidation
Proceeding in conjunction with the Liquidator's Plan
of Liquidation and pursuant to further order(s) of the
Liquidation Court.

         . . . .

4.   The Liquidator and Phoenix agree that the
Policies shall be deemed to be hereby surrendered
(pursuant to the voluntary surrender provisions of the
Policies), canceled or otherwise terminated, all as of
the Effective Date of this Agreement.  . . .  The
Liquidator and Phoenix agree that the Policies have
terminated as of the Effective Date of this Agreement;
that no further rights of recovery exist under the
Policies, at law or in equity; that any and all rights
under the Policies, aside from those expressly stated
in this Settlement Agreement, shall be deemed
released; and that both the Liquidator and Phoenix are
deemed released from any and all claims or obligations
under the Policies, to the extent that any such claims
or obligations exist. . . .

         . . . .

9.   The Liquidator, in his capacity as
Liquidator and on behalf of [Noble] (for itself and in
any and all capacities in which it is named or has
acted . . . in connection with any of the Policies) .
. . hereby releases, acquits and discharges Phoenix .
. . from and against any and all claims, demands,
obligations, liabilities, and causes of action, of any
nature whatsoever, at law or in equity, asserted or
unasserted, known or unknown, relating in any way to
the Policies.

Id. at 3-6.  Like the Plan, the Agreement has yet to be approved
by the Superior Court and so, by its own terms, it is not yet
effective.  It is unclear whether any deadline for objecting to
the Agreement has been set, or has passed, but that seems
unlikely given that the Agreement was executed three days after
the Liquidator submitted the Plan, and the Plan appears to be
open to objection whenever the Superior Court lifts the stay.

In any event, based on the foregoing, Credit Suisse has
sued Phoenix in five counts, seeking damages for breach of
contract (Counts I and II) and promissory estoppel (Count IV)
and also requesting a declaratory judgment (Count III) and
injunctive relief (Count V).

## Discussion

Phoenix has moved to dismiss all five of Credit Suisse's
claims.  In the alternative, Phoenix asks the court to: (1)
abstain from exercising jurisdiction over Credit Suisse's claims
in deference to the ongoing liquidation proceeding; or (2) stay
this proceeding pending the joinder of an indispensable party,
to wit, the Liquidator.

### A. Count I

Count I is Credit Suisse's claim that by entering into the
Settlement Agreement with the Liquidator, Phoenix has breached

the three policies at issue here by repudiating its obligations under those policies.  Phoenix argues that Count I fails to state a claim for breach of contract because anything it might do that would violate the terms of the policies, such as terminating them and paying the surrender value to the Liquidator, cannot be done unilaterally, but can only be done with the approval of the Superior Court.  Credit Suisse disagrees, arguing that because the Agreement clearly indicates Phoenix's belief that it is not bound by the terms of the policies, the act of signing it brings this case squarely within the bounds of anticipatory repudiation, as that doctrine has been adopted by and developed in the common law of Minnesota. Phoenix has the better argument.

The parties agree that this case is governed by Minnesota law.  In what appears to be a seminal case, the Minnesota Supreme Court held:

> That, where one party to an executory contract repudiates it by refusing to be bound by its terms, the other party may take him at his word, and act upon it by treating the contract at an end, and bring an action for damages for its breach, is, of course, elementary.  The only question is, what will constitute a repudiation?  The true test, stated generally, is whether the acts and conduct of the party evinced an intention no longer to be bound by the contract; and the fair result of the authorities is that it is not only an absolute refusal in words to perform a contract, but also any clear manifestation by words or acts of an intention not to perform it according to its terms, that will authorize the other

> party to treat this as a repudiation and bring his
> action.  Consequently, where the seller receives
> notice from the buyer that he will not pay the
> contract price for the goods, he has a right to treat
> this as a repudiation of the contract, stop delivery,
> and bring his suit for damages.

Armstrong v. St. Paul & Pac. Coal Co., 50 N.W. 1029, 1029 (Minn.

1892).  Over a century later, the same court explained that

"anticipatory breach is the 'unconditional repudiation of a

contract, either by words or acts, which is communicated to the

other party prior to the time fixed for his performance.'"

Dyrdal v. Golden Nuggets, Inc., 689 N.W.2d 779, 785 n.4 (Minn.

2004) (quoting In re Haugen, 278 N.W.2d 75, 79 n.6 (Minn. 1979))

(brackets omitted).  More specifically:

> (W)here one party to an executory contract,
> before the performance is due, expressly
> renounces the same and gives notice that he will
> not perform it, his adversary, if he so elects,
> may treat the renouncement as a breach of the
> contract and at once bring an action for damages.
> * * *.
>
> (T)he refusal to perform must in effect be an
> unqualified renunciation or repudiation of the
> contract.  A mere refusal, not of that character,
> will not obviate the necessity of a tender.

Matteson v. United States & Canada Land Co., 115 N.W.
195, 196-97 ([Minn.] 1908). . . .  Where a party to an
executory contract places itself in a position where
it cannot perform the contract, or where the party
otherwise prevents performance of the contract, the
other contracting party may treat the contract as
anticipatorily breached.  E.g., Wormsbecker v. Donovan
Constr. Co., 76 N.W.2d 643, 650 ([Minn.] 1956).
Crowell v. Northwestern National Life & Savings Co.,

12

108 N.W. 962, 964 ([Minn.] 1906).  Accord, McFerran v.
Heroux, 269 P.2d 815 ([Wash.] 1954).

Space Center, Inc. v. 451 Corp., 298 N.W.2d 443, 450 (Minn.
1980) (parallel citations omitted).

As a preliminary matter, this case falls far outside the
heartland of repudiation or anticipatory breach cases.  See,
e.g., Armstrong, 50 N.W. at 1029 (buyer informed seller, prior
to delivery, that buyer would not pay agreed-upon purchase
price, but only a lesser sum); Engel v. Mahlen, 189 N.W. 422,
423 (Minn. 1922) (defendants, who had purchase-and-sale
agreement with plaintiff, sold subject property to third party,
thus disabling themselves from performing under the agreement,
thereby repudiating it); Unique Sys., Inc. v. Zotos Int'l, Inc.,
622 F.2d 373, 376-77 (8th Cir. 1980) (buyer repudiated contract
with seller by demanding performance to which it was not
entitled under the contract, and refusing to perform its own
obligations until seller complied with its demands); Space
Center, 298 N.W.2d at 450 (real estate seller's "irrevocable
loss of title [to the subject property] was sufficient conduct
to constitute a repudiation" of its contract to sell property to
plaintiff).  More importantly, however, on the facts alleged in
the complaint, Phoenix has not communicated an unconditional or
unqualified refusal to perform its obligations under the

policies nor has Phoenix placed itself in a position where it cannot perform its obligations under the policies.

There are two reasons why Phoenix's execution of the Settlement Agreement cannot be characterized as an unconditional or unqualified refusal to honor its obligations under the policies.  First, the Superior Court's Orders of March 27 and June 11, 2008, actually bar Phoenix from terminating the policies.  Thus, those Orders impose a condition upon Phoenix's current ability to do anything that would violate its obligations under the policies.  Beyond that, Phoenix's ability to exercise its right (or perform its obligation) to terminate the policies, under the Agreement, is expressly conditioned upon the Superior Court's approval of the Agreement.  So, this is not a case in which Phoenix has told Credit Suisse that it plans to breach the contracts at issue.  Rather, to the extent Phoenix has said anything to Credit Suisse, it has communicated its intention to abide by a court-approved agreement between itself and the Liquidator.

In addition, on the facts alleged in the complaint, when and if Phoenix finds itself in a position to terminate the policies without paying Credit Suisse their surrender value, that will not be a position in which Phoenix will have placed itself.  Rather, Phoenix's ability to terminate the policies is

14

entirely in the hands of the Superior Court which will, or will not, place Phoenix in a position to take the steps outlined in the Settlement Agreement.  As noted above, the Agreement has yet to be approved by the Superior Court, and it appears that when the stay is lifted, the Superior Court will entertain objections to it.  Credit Suisse's disagreement with the terms of the Agreement, or with the Liquidator's decision to include the policies in the inventory of liquidation estate, do not give Credit Suisse a cause of action for breach of contract against Phoenix.

      B. Count II

Count II is Credit Suisse's claim that by entering into the Settlement Agreement with the Liquidator, Phoenix has breached the promises it made in the Acknowledgements by repudiating the obligations it assumed when it executed those documents.  While it appears to the court that Phoenix could frame a plausible argument that the Acknowledgements are not enforceable contracts, Phoenix assumes that they are.  Then Phoenix argues that because the Acknowledgements did not impose any obligations above and beyond those delineated in the policies (owed initially to the ownership trusts and then, by assignment, to Credit Suisse), it is entitled to dismissal of Count II for the same reasons it is entitled to dismissal of Count I.  That

argument is persuasive, and entitles Phoenix to dismissal of Count II.

C. Count IV

Count IV, captioned "Promissory Estoppel," is Credit Suisse's claim that Phoenix should be bound by the promises it made in the Acknowledgements and that it broke those promises by entering into the Settlement Agreement.  Under Minnesota law, "promissory estoppel . . . 'implies a contract in law where no contract exists in fact.'"  Zinter v. Univ. of Minn., 799 N.W.2d 243, 246 (Minn. Ct. App. 2011) (quoting Deli v. Univ. of Minn., 578 N.W.2d 779, 781 (Minn. Ct. App. 1998)).  Because Phoenix does not defend against Count II on grounds that the Acknowledgments were not enforceable contracts, there is no basis for applying the doctrine of promissory estoppel and, as a consequence, Phoenix is entitled to dismissal of Count IV.

D. Count III

Count III is Credit Suisse's request for a declaratory judgment.  In a somewhat prolix claim, Credit Suisse seeks favorable determinations on eleven separate propositions:

> that Phoenix's purported rescission, termination, surrender, or cancellation of the Policies is legally ineffective, incorrect and invalid;

> that the Policies are enforceable;

that Phoenix must honor the Policies;

that the Collateral Assignments and the
Acknowledgements and Consents remain valid and
enforceable with respect to Phoenix;

that Phoenix remains obligated under the
Acknowledgements and Consents to pay any amounts due
under the Policies to Credit Suisse as long as the
Collateral Assignments for such Policies remain in
effect;

that Phoenix's repudiation of its obligations under
those contracts is legally ineffective, incorrect and
invalid;

that Phoenix is legally obligated to honor its promise
made to Credit Suisse under the Acknowledgements and
Consents to pay any amounts due under the Policies to
Credit Suisse as long as the Collateral Assignments
for such Policies remain in effect;

that the purported Settlement Agreement is invalid,
void, unenforceable, and of no legal effect;

that the Settlement Agreement does not operate to
extinguish, release, invalidate, terminate, void,
surrender, or impair in any way Credit Suisse's
contractual rights with respect to Phoenix under the
Policies, the Collateral Assignments and the
Acknowledgements and Consents;

that the Settlement Agreement does not operate to
extinguish, release, invalidate, terminate, void,
surrender, or impair in any way Phoenix's contractual
obligations and promises to Credit Suisse under the
Policies, the Collateral Assignments and the
Acknowledgements and Consents; and

that enforcing the Settlement Agreement to bar Credit
Suisse's rights and claims against Phoenix would
constitute an injustice.

Compl. ¶¶ 72-75.  After stripping out those requests for

declaratory relief that are essentially restated claims for

breach of contract, what remains of Count III is a request for the court to declare that Phoenix's obligations to Credit Suisse would not be affected by the Settlement Agreement if the Superior Court were to approve it.  Phoenix argues that Count III should be dismissed because the Superior Court has not yet approved the Agreement, which means that there is as yet no actual controversy between itself and Credit Suisse.  In Phoenix's view, absent an actual controversy, any ruling by this court would be an impermissible advisory opinion rather than a proper declaratory judgment.  Credit Suisse disagrees, arguing that Phoenix's execution of the Agreement, standing on its own, is enough to create a present case or controversy.

The federal Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ."  28 U.S.C. § 2201(a).  While the parties argue over whether their difference of opinion concerning their respective rights and obligations under the policies has ripened into an actual legal controversy, Count III must be dismissed for a more fundamental reason.

In Buck v. American Airlines, Inc., the First Circuit made the following relevant observation:

> Although the plaintiffs style "declaratory judgment" as a cause of action, the provision that they cite, 28 U.S.C. § 2201(a), creates a remedy, not a cause of action.  See, e.g., Muirhead v. Mecham, 427 F.3d 14, 17 n.1 (1st Cir. 2005) (noting that section 2201 "neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief" (internal quotation marks omitted)).

476 F.3d 29, 33 n.3 (1st Cir. 2007) (emphasis added).  Here, Credit Suisse, which is not a party to the Settlement Agreement, asks the court to declare the Agreement to be void, and does so in an action that includes only one of the two parties to it. But, more importantly, neither Credit Suisse's complaint nor its objection to Phoenix's motion to dismiss identifies any underlying cause of action for which declaratory relief would be an appropriate remedy.  That is, Credit Suisse does not suggest any legal theory that would support a declaration that the Agreement is void.  Because Credit Suisse has not identified any legal basis for the declaratory relief it seeks, Count III does not state a claim upon which relief can be granted.

E. Count V

Count V is Credit Suisse's request for an injunction against Phoenix that:

(1) enjoins Phoenix from rescinding, surrendering,
terminating, declaring void, invalid, unenforceable or
null, any of the Policies; (2) enjoins Phoenix from
enforcing the Settlement Agreement with respect to any
of Credit Suisse's rights and claims; (3) enjoins
Phoenix from distributing any premiums it received for
the Policies to anyone other than Credit Suisse; (4)
enjoins Phoenix from entering into any agreement that
abrogates Credit Suisse's rights under the terms of,
or constitutes a breach of, the Acknowledgement and
Consents executed by Phoenix; and (5) enjoins Phoenix
from entering into any agreement that purports to
extinguish the rights of Credit Suisse relative to the
financing and trust documents at issue, including
without limitation, the Collateral Assignments and the
Acknowledgement and Consents.

Compl. ¶ 88.  At the hearing, when asked just what the
injunction it seeks would look like, Credit Suisse indicated
that it wants the court to enjoin Phoenix from interpreting the
Settlement Agreement to bar the claims for breach of contract on
which Credit Suisse seeks to hold Phoenix liable.  Of course,
how Phoenix interprets the Agreement is beside the point.  What
Credit Suisse really seeks to avoid is the following scenario:
(1) the Superior Court approves the Agreement; (2) Phoenix pays
the surrender value of the policies to the Liquidator; (3)
Credit Suisse sues Phoenix for breach of contract in an attempt
to recover the premiums it has paid on the policies; (4) Phoenix
invokes the provision in the Agreement barring claims against it
by third parties; and (5) the court sides with Phoenix and holds
Credit Suisse's claim to be barred.  In Credit Suisse's view, an

inability to recover damages for breach of contract would be an irreparable harm that warrants an award of injunctive relief.

Phoenix argues that Count V should be dismissed because: (1) the relief Credit Suisse seeks is barred by the Anti-Injunction Act, 28 U.S.C. § 2283; and (2) "the enforcement of contracts by injunction is the exception rather than the rule," Ocean Spray Cranberries, Inc. v. PepsiCo, Inc., 160 F.3d 58, 61 (1st Cir. 1998).  Credit Suisse argues that: (1) the Anti-Injunction Act does not apply because it does not seek to enjoin any state-court proceeding, but only asks the court to enjoin Phoenix from breaching its contracts; (2) the difficulty of determining the damages flowing from Phoenix's breach of contract makes this one of those rare cases where an injunction against breaching a contract is appropriate; and (3) dismissal at this stage would be premature given that the determination of whether to enjoin the breach of a contract is highly fact specific.

Count V is subject to dismissal for the same reason as Count III; Credit Suisse has identified no legal basis for a ruling in its favor.  Quite understandably, Credit Suisse would like the Settlement Agreement not to affect whatever rights under the policies it was granted by the collateral assignments. But, Credit Suisse cites no rule of law under which it would be

entitled to a ruling that its rights somehow lie beyond the reach of the Agreement.  There may well be good arguments in support of that proposition, but Credit Suisse has not even hinted at what their legal basis might be.  Accordingly, Count V does not state a claim upon which relief can be granted.

### Conclusion

The bottom line is this.  The contractual relationship(s) between Credit Suisse and Phoenix, and any disputes that may arise thereunder, do not exist in a vacuum.  Rather, the Liquidator's inclusion of the Phoenix policies in the liquidation estate added an element to the relationship between Credit Suisse and Phoenix that cannot be ignored under any of the legal theories on which Credit Suisse bases its claims against Phoenix.  Credit Suisse asks the court to prevent the Settlement Agreement from affecting its rights under the policies, but offers the court no legal basis for doing so. Finally, however, based upon Phoenix's representations at the hearing, it would appear that Credit Suisse is not without recourse.  Once the stay is lifted in the liquidation proceeding, it seems that Credit Suisse will have a forum in which to protect its interests in the policies.

For the reasons given, Credit Suisse's motion to dismiss, document no. 19, is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge


August 22, 2011

cc:  John E. Failla, Esq.
     Jarrett E. Ganer, Esq.
     Thomas F.A. Hetherington, Esq.
     Russell F. Hilliard, Esq.
     William C. Komaroff, Esq.
     Nathan R. Lander, Esq.
     Justin C. Richardson, Esq.
     Andrew W. Serell, Esq.
     Hutson B. Smelley, Esq.